# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

——

Argued September 12, 2014      Decided October 14, 2014

No. 13-1259

SHIELDALLOY METALLURGICAL CORPORATION,
PETITIONER

v.

NUCLEAR REGULATORY COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

STATE OF NEW JERSEY,
INTERVENOR

——

On Petition for Review of an Order of
the U.S. Nuclear Regulatory Commission

——

*Jay E. Silberg* argued the cause for petitioner. With him on the briefs were *Matias F. Travieso-Diaz*, *Stephen L. Markus*, and *Alison M. Crane*.

*Andrew P. Averbach*, Solicitor, U.S. Nuclear Regulatory Commission, argued the cause for respondents. With him on the brief were *Robert G. Dreher*, Acting Assistant Attorney General, U.S. Department of Justice, *Lane N. McFadden*,

Attorney, and *Grace H. Kim*, Senior Attorney, U.S. Nuclear Regulatory Commission.

*Andrew D. Reese* argued the cause and filed the brief for intervenor State of New Jersey.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Shieldalloy Metallurgical Corporation petitions for review of a Nuclear Regulatory Commission ("NRC" or "Commission") order reinstating the transfer of regulatory authority to the State of New Jersey under the Atomic Energy Act, 42 U.S.C. § 2021. The NRC issued the order under review, *Shieldalloy Metallurgical Corp.*, CLI-13-06, 78 NRC __ (Aug. 5, 2013) ("Order"), to address concerns raised by this Court in *Shieldalloy Metallurgical Corp. v. NRC*, 707 F.3d 371 (D.C. Cir. 2013) ("*Shieldalloy II*"). We conclude that the NRC has rationally addressed these concerns when it provided a textual analysis of 10 C.F.R. § 20.1403 and explained how New Jersey's regulatory regime is adequate and compatible with the NRC's regulatory program. Contrary to Shieldalloy's arguments, the NRC's Order does not conflict with its prior interpretations or amount to a convenient, post hoc litigating position. We therefore deny Shieldalloy's petition for review.

## I.

Shieldalloy manufactured metal alloys in Newfield, New Jersey for approximately fifty years. While processing the raw materials and ores necessary to produce the metal alloys, Shieldalloy generated radioactive byproducts. Shieldalloy had an NRC license to store these byproducts on site. When

it ceased operations at the Newfield site in 1998, Shieldalloy had accumulated approximately 65,800 cubic meters of radioactive materials containing uranium (U-238) and thorium (Th-232). Intervenor New Jersey reminds us that the average household refrigerator has approximately one cubic meter of storage. The half-life for uranium and thorium exceeds four billion years, and Shieldalloy stores these byproducts in uncovered waste piles on the site, which is located near residences and businesses.

The present petition is the third to reach this Court in a longstanding dispute over the rules governing what Shieldalloy must do with the radioactive waste at its Newfield site. Around the time that Shieldalloy first sought to decommission the site, the NRC developed and published rules for decommissioning licensed facilities, referred to as the license termination rule or "LTR." *See* 10 C.F.R. §§ 20.1401–06. The LTR provisions "provide specific radiological criteria for the decommissioning of lands and structures . . . to ensure that decommissioning will be carried out without undue impact on public health and safety and the environment." Final Rule, Radiological Criteria for License Termination, 62 Fed. Reg. 39,058, 39,058 (July 21, 1997). The rules generally express the NRC's preference to decommission a site in a way that allows for the unrestricted future use of the property. *Id.* at 39,069. As its name suggests, unrestricted use contemplates that there will be no limit to public use of the land in the future, and access will be "neither limited nor controlled by the licensee." 10 C.F.R. § 20.1003. In its final rulemaking, the NRC explained that "termination of a license for unrestricted use is preferable because it requires no additional precautions or limitations on use of the site after licensing control ceases, in particular for those sites with long-lived nuclides." 62 Fed. Reg. at 39,069. To qualify for unrestricted release, the licensee must physically remove or decontaminate radioactive material to

ensure that the residual levels of radioactivity remaining on site result in doses of radiation no higher than 25 millirem per year. *See* 10 C.F.R. § 20.1402. By way of context, a chest x-ray typically gives a dose of 10 millirem. Doses in Our Daily Lives, http://www.nrc.gov/about-nrc/radiation/around-us/doses-daily-lives.html (last visited Oct. 14, 2014).

Under limited circumstances, the LTR provisions also allow licensees to dispose of radioactive waste on site with restricted future use. 62 Fed. Reg. at 39,069; *see also* 10 C.F.R. § 20.1403. Restricted use means that access to the area "is limited by the licensee for the purpose of protecting individuals against undue risks from exposure to radiation and radioactive materials." 10 C.F.R. § 20.1003. In contrast to unrestricted release, a licensee seeking restricted release is allowed to achieve the 25 millirem per year dose limit by installing controls to limit access to radioactive material left on site. *See id.* § 20.1403(b).

Shieldalloy has consistently sought to dispose of its radioactive waste on site through restricted future use. *See, e.g.*, Decommissioning of Shieldalloy Metallurgic Corporation's Facility in Newfield, NJ, 58 Fed. Reg. 62,387, 62,388-89 (Nov. 26, 1993). Between 2002 and 2009, Shieldalloy submitted four versions of its on-site decommissioning plan, but the NRC never accepted any of the plans. The NRC Commissioner urged Shieldalloy to explore options other than on-site decommissioning.

Independent of the NRC's discussions with Shieldalloy, the governor of New Jersey requested that the Commission transfer its nuclear regulatory authority to the State of New Jersey as authorized by the Atomic Energy Act. *See* Notice of Proposed Agreement, 74 Fed. Reg. 25,283, 25,283-87 (May 27, 2009). Under the statute, the NRC "shall enter into an agreement" to transfer its authority to a state if it finds the state's regulatory regime is "adequate to protect the public

health and safety" and "compatible with the Commission's program." 42 U.S.C. § 2021(d). The Commission called for comments regarding the transfer, and Shieldalloy argued that New Jersey's regulatory regime was not compatible with federal regulations. The NRC rejected these arguments and issued an order denying Shieldalloy's motion to stay the transfer of authority to New Jersey. When the transfer occurred, the Commission forwarded Shieldalloy's pending decommissioning plan to New Jersey. About two weeks later, New Jersey informed Shieldalloy that the plan was unacceptable and asked Shieldalloy to submit a new decommissioning plan that complied with state regulations. Shieldalloy has yet to submit a revised plan to New Jersey.

Fearing that it would have to abandon its restricted release decommissioning plan and be forced to adopt a more expensive unrestricted release plan, Shieldalloy petitioned this Court for review of the NRC's transfer of authority. *Shieldalloy Metallurgical Corp. v. NRC*, 624 F.3d 489 (D.C. Cir. 2010) ("*Shieldalloy I*"). We held in *Shieldalloy I* that the transfer of authority was arbitrary and capricious because the NRC did not provide a sufficient explanation for its actions. *Id.* at 495. After remand, the NRC gave Shieldalloy and New Jersey a fresh opportunity to comment on the transfer. The NRC conducted a full review, examined all issues anew, and reinstated the transfer of its regulatory authority to New Jersey.

For a second time, Shieldalloy petitioned this Court for review, arguing that the NRC followed neither its own regulations nor the requirements of the Atomic Energy Act. *Shieldalloy II*, 707 F.3d at 376-77. Again, this Court vacated the transfer of authority. *Id.* at 383. The Court was unpersuaded by the Commission's explanation of its interpretation of 10 C.F.R. § 20.1403(a), which permits a licensee to terminate its license under restricted conditions if

it can demonstrate that further reductions in residual radioactivity would result in net public or environmental harm, or if further reductions are not being made because levels of residual radioactivity are already as low as reasonably achievable ("ALARA"). *Id.* at 379. Because the NRC's interpretation of this rule "lacked an apparent textual basis," the Court remanded for "the Commission [to] explain itself." *Id.* at 382.

On remand, the NRC issued CLI-13-06, the Order now under review. The Commission reinstated the transfer of authority to New Jersey and "provide[d] additional explanation to clarify that § 20.1403(a) is consistent with (and, in fact, codifies) our preference that licensees satisfy our radiation dose criteria for license termination through unrestricted-release decommissioning if it is cost-beneficial to do so." Order at 3-4. The NRC explained that the ALARA principle in § 20.1403(a) provides an initial eligibility test for restricted release, and reaffirmed its prior conclusion that New Jersey's regulatory regime is adequate and compatible with NRC's regulations. Order at 23. The NRC also clarified how its interpretation is consistent with prior practices and interpretations. Order at 18-23.

Shieldalloy again petitions this Court to vacate the NRC's Order transferring regulatory authority to New Jersey.

## II.

We review NRC final orders under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard of review, an agency must "set forth its reasons for decision," *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (internal quotation marks omitted) (quoting *Roelofs v. Secretary of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)), and "'respond meaningfully' to objections raised

by a party," *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)). When the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," we will uphold its decision. *Transcontinental Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 919 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007)).

An agency's interpretation of its own regulations is entitled to "substantial deference" and is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Deference is appropriate even if the agency's interpretation first appears during litigation, *see Auer v. Robbins*, 519 U.S. 452, 462-63 (1997), unless the interpretation conflicts with prior interpretations or amounts to "nothing more than a convenient litigating position," *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citation omitted).

Shieldalloy argues that the NRC's transfer of regulatory authority to New Jersey was arbitrary and capricious because the NRC did not rationally explain how New Jersey's regulatory regime is "adequate to protect the public health and safety" or "compatible with the Commission's program" under 42 U.S.C. § 2021(d)(2). We disagree. As we explain below, we discern no reason to invalidate the NRC's transfer of regulatory authority. Accordingly, we conclude that the NRC addressed the concerns raised in *Shieldalloy II* and rationally explained how New Jersey's regulatory regime is adequate and compatible with the NRC's regulations.

8

**A.**

Shieldalloy contends that New Jersey's regulations are inadequate to protect public health and safety because New Jersey's program does not provide restricted use options that will best reduce the public's exposure to doses of radiation. NRC regulations provide licensees like Shieldalloy a restricted use option as a "reasonable means for terminating licenses at certain facilities" so long as the decommissioning is "properly designed" and there are "proper controls" in place. 62 Fed. Reg. at 39,069. Shieldalloy argues that New Jersey's program, however, is not as safe as the NRC's regime because New Jersey's regulations do not incorporate the ALARA principle and essentially bar a licensee from decommissioning a site with restricted future use. Shieldalloy complains that it is virtually impossible for it to decommission the Newfield facility for restricted release under New Jersey's regulations. Pet. Br. 64. To support its argument, Shieldalloy points to NJRAD Form-314, the disposition certificate that licensees must file to decommission a site, because it only allows the licensee to request "release for unrestricted use" and not restricted use. *See* Pet. Reply Br. 26 (discussing the October 3, 2012 version of the form).

This Court previously rejected Shieldalloy's argument "that the New Jersey rules were more stringent but less safe" than the NRC standards. *Shieldalloy II*, 707 F.3d at 375. Addressing the statutory requirement that a state program must be adequate to protect the public health and safety, we concluded that the NRC, "on its second attempt, . . . adequately addressed Shieldalloy's claims arising out of . . . the parties' conflicting interpretations of § 2021." *Id.* We need not revisit that conclusion.

Contrary to Shieldalloy's argument, New Jersey's regulatory regime applies the ALARA principle to

decommissioning activity because state regulations incorporate by reference several provisions of 10 C.F.R. Part 20, including § 20.1101(b) (requiring licensees to use protection principles to achieve doses to the public that are ALARA for all licensed activity). N.J. Admin. Code § 7:28-6.1(a). By incorporating § 20.1101(b), New Jersey expressly requires the application of the ALARA principle for license termination and decommissioning. New Jersey's program therefore protects public health and safety through ALARA just like the NRC's regulatory regime.

New Jersey's regulations also permit license termination with restricted future use. New Jersey's regulations include options for licensees to decommission a site with "limited restricted use" as well as "restricted use." *See* N.J. Admin. Code § 7:28-12.9(a)(1) (listing remediation standards for radionuclides in soil). And New Jersey regulations even provide a restricted use decommissioning option with alternative standards. N.J. Admin. Code § 7:28-12.11(a). Under the alternative standards option, the licensee is not required to meet the soil concentration levels under N.J. Admin. Code § 7:28-12.9 but is instead required to perform computer dose modeling to ensure that the radioactivity from the site will not cause a future on-site resident or worker to receive more than a 15 millirem dose of radiation in a given year. N.J. Admin. Code § 7:28-12.11(a)(1), (f)(2). At oral argument, New Jersey made clear that it changed its certification form to conform to its regulatory program, which permits the restricted release of sites. When filing the updated NJRAD Form-314, a licensee can now request that New Jersey releases the site for restricted use in accordance with state regulations. *See* NJRAD Form-314 (Revised May 23, 2014), *available at* www.state.nj.us/dep/rpp/rms/agreedo wn/Termination.pdf.

Like the NRC's regulations, New Jersey's regulations also incorporate a preference for the removal of radioactive materials to meet unrestricted conditions. Most importantly, New Jersey's regulations express a preference for unrestricted release that is more protective of the public health than the NRC's regulations. To qualify for "limited restricted use" or "restricted use" under N.J. Admin. Code § 7:28-12.9, the licensee must remove sufficient radioactive materials to ensure a future on-site resident or worker receives no more than a 15 millirem dose of radiation in a given year. The alternative standards similarly require the removal of waste so that a person would only be exposed to a 15 millirem dose on site. N.J. Admin. Code § 7:28-12.11(a)(1), (f)(2). And if all controls failed, the dose to the public cannot exceed 100 millirem per year. *See* § 7:28-12.11(e). New Jersey's alternative standards are more stringent than the NRC's restricted release option. The NRC allows a maximum exposure of 25 millirem per year for a person, 10 C.F.R. §§ 20.1402, 20.1403(b), and an overall dose to the public of up to 500 millirem per year if controls failed, § 20.1403(e).

Contrary to Shieldalloy's arguments, the NRC's transfer of authority is not arbitrary and capricious simply because New Jersey's regulations impose more stringent requirements. Indeed, the NRC has always contemplated transferring authority to states under the agreement state program so long as "[t]he overall level of protection of public health and safety provided by a State program [is] equivalent to, *or greater than*, the level provided by the NRC program." Statement of Principles and Policy for the Agreement State Program, 62 Fed. Reg. 46,517, 46,524 (Sept. 3, 1997) (emphasis added); *id.* at 46,520 ("[T]he more stringent requirements do not preclude or effectively preclude a practice in the national interest without an adequate public health and safety or environmental basis related to radiation protection."); *see also Shieldalloy II*, 707 F.3d at 375. We therefore conclude under

the first statutory requirement that the NRC rationally explained how New Jersey's "program is adequate to protect the public health and safety." 42 U.S.C. § 2021(d)(2).

**B.**

Under the second statutory requirement of § 2021(d)(2), Shieldalloy argues that the NRC's transfer of regulatory authority to New Jersey was arbitrary and capricious because the NRC did not adequately explain how New Jersey's regulatory regime is compatible with the Commission's program. Shieldalloy suggests that New Jersey's regulations are incompatible with the NRC's regulations because they do not conform to the NRC's restricted release rule, 10 C.F.R. § 20.1403. Under Shieldalloy's reading of the rule, the NRC permits a licensee to terminate its license under restricted conditions whenever the licensee can show that restricted release will cost-beneficially ensure lower radiation doses than the radiation doses associated with unrestricted use, which requires the costly removal of radioactive waste. In other words, Shieldalloy contends that § 20.1403(a) requires the licensee to compare the costs and benefits (including the potential radiation doses to the public) of restricted as well as unrestricted release, and then select the option that will cost-beneficially result in the lowest exposure of radiation doses to the public.

Shieldalloy points to the text of § 20.1403(a) and the definition of ALARA, which refers to dose levels—ALARA "means making every reasonable effort to maintain exposures to radiation as far below the *dose limits* . . . as is practical." 10 C.F.R. § 20.1003 (emphasis added). Because § 20.1403(a) incorporates the ALARA standard, Shieldalloy contends that this requires a cost-benefit comparison of dose levels associated with leaving the materials on site (restricted release) versus removing the materials from the site (unrestricted release). Shieldalloy argues that the NRC's

interpretation to the contrary amounts to a post hoc litigation position that is inconsistent with the NRC's prior practices and interpretations.

We reject Shieldalloy's arguments and conclude that the NRC adequately explained, based on "the authorities on which it purports to draw," how New Jersey's regulations are compatible with its own regulations. *Shieldalloy II*, 707 F.3d at 375. Shieldalloy's counsel acknowledged at oral argument that New Jersey's program is compatible with NRC regulations if we accept NRC's reading of § 20.1403(a), which we do. The NRC's reasonable interpretation of § 20.1403, which is owed substantial deference, neither conflicts with prior interpretations, nor amounts to a convenient litigating position. *See SmithKline Beecham Corp.*, 132 S. Ct. at 2166.

**1.**

Contrary to Shieldalloy's argument, 10 C.F.R. § 20.1403(a) does not require the licensee to compare radiation doses to the public under restricted release and unrestricted release decommissioning plans. Instead, the NRC reasonably reads § 20.1403(a) as an eligibility test for the licensee to explain why, based on a cost-benefit analysis, it should be relieved of its burden to take further remedial measures required for unrestricted release. To qualify for restricted release, the licensee must first explain why it is not further reducing the proposed level of residual radioactivity. Order at 13. The licensee establishes its eligibility for restricted-use decommissioning only if further reductions in residual radioactivity necessary to comply with the provisions of § 20.1402 (1) "would result in net public or environmental harm," or (2) "were not being made because the residual levels associated with restricted conditions are ALARA." *Id.* (quoting § 20.1403(a)). This "inquiry has nothing whatever to do with accomplishing or assessing dose reductions using

restricted release or comparing restricted-release and unrestricted-release dose" levels. *Id.* at 15.

The NRC explained how its reading gives full effect to the language of the regulation, which focuses solely on "further reductions in residual radioactivity" necessary to accomplish unrestricted release under the provisions of § 20.1402. Order at 12. NRC regulations define "residual radioactivity" as the "radioactivity in structures, materials, soils, groundwater, and other media at a site resulting from activities under the licensee's control." 10 C.F.R. § 20.1003. While it is possible to reduce the doses of radioactivity to the public from residual radioactivity using controls or engineering associated with restricted use, the NRC explained that "it is not possible to *reduce* 'residual radioactivity' itself simply by taking these steps." Order at 12-13 (emphasis in original). Instead, a licensee can only reduce residual radioactivity by physically removing radioactive material from the site, which is associated with unrestricted release decommissioning under § 20.1402. *Id.* at 15. Section 20.1403 therefore requires the licensee to explain why it is not cost beneficial to remove additional radioactive waste from the site before it can qualify for restricted release.

This Court previously recognized that "[t]he language of § 20.1403(a) is silent as to why an ALARA analysis of restricted release would cause a licensee not to pursue unrestricted release." *Shieldalloy II*, 707 F.3d at 379. The NRC acknowledges that the language of the rule "might, at first glance, appear to focus on some defining property of restricted release, such as the dose that could be cost-beneficially achieved under a licensee's restricted-release plan." Order at 16. But when the reference to ALARA in § 20.1403(a) is read in connection with the other language of the sentence—specifically, why "further reductions in residual activity" are not being made—it undermines

Shieldalloy's dose-comparison reading. Moreover, even Shieldalloy concedes (as it must) that the definition of ALARA incorporates more than just dose limits because the ALARA principle encompasses the reasonable effort for radiological protection based on "practical" considerations and "quantitative cost-benefit analysis." Pet. Br. at 34-35.

Under this broader conception of ALARA as encompassing cost-benefit analysis, the NRC rationally explained that the ALARA analysis from § 20.1403(a) asks whether the *proposed* residual levels of radioactivity sought to be left in place under the restricted use plan are already as low as reasonably achievable, "such that 'further' removal or decontamination would not be cost-beneficial." Order at 17. The licensee thus applies ALARA to analyze the quantitative costs and benefits for achieving further reductions in the residual levels of radioactivity. And a licensee becomes eligible for restricted release if the proposed level of residual radioactivity results in doses that exceed the levels allowable for unrestricted release (25 millirem) under § 20.1402 but is nevertheless cost beneficial because it is not possible to further reduce the residual radioactivity in a cost-effective way. *Id.*

The second sentence of § 20.1403(a) buttresses the NRC's broader reading of ALARA as requiring more than just a dose-level comparison. The licensee must consider "detriments, such as traffic accidents, expected to potentially result from decontamination and waste disposal" in the ALARA analysis. 10 C.F.R. § 20.1403(a). The inclusion of this requirement further confirms and supports NRC's reading that the ALARA analysis in § 20.1403(a) focuses on reducing residual radioactivity because traffic accidents resulting from decontamination and waste disposal can only occur in connection with the removal and transportation of materials away from the site. Order at 16; *see also Shieldalloy II*, 707

F.3d at 380 ("Traffic accidents related to waste disposal would seem to have little to do with restricted release, which involves on-site disposal of radioactive materials."). On the other hand, Shieldalloy's reading of the first sentence of § 20.1403(a) is "in tension" with the second sentence of the regulation because Shieldalloy's reading would "permit restricted release irrespective of the merits of unrestricted release." *Shieldalloy II*, 707 F.3d at 380. We reject Shieldalloy's reading because it turns the NRC's well-established preference for unrestricted release on its head. *See id.* (citing instances where the NRC has "repeatedly stated it holds that preference").

**2.**

The NRC's interpretation of § 20.1403(a) not only incorporates its preference for unrestricted release, but is also consistent with the NRC's other regulatory statements. Order at 18-23. The NRC enacted § 20.1403(a) "to prevent licensees from choosing restricted release," not to encourage it. Resp. Br. 59-60 (emphasis removed). The NRC prefers that a licensee decommission its site under § 20.1402 with unrestricted release, and that is why there is an eligibility test to qualify for restricted release under § 20.1403(a). *Id.* at 48. Shieldalloy's interpretation would "eviscerate NRC's preference for unrestricted release" because a licensee would almost always be able to choose restricted release by showing that the removal of waste for unrestricted release is more costly than erecting barriers to limit access to the site. *Id.* at 59. We therefore reject Shieldalloy's reading of the regulation.

Shieldalloy mischaracterizes the NRC's position as a convenient, post hoc litigating position that conflicts with the NRC's prior interpretations of § 20.1403(a). Even assuming the NRC is advancing its position for the first time in litigation (an assumption we do not hold), we still owe

deference to the NRC's interpretation under *Auer*, 519 U.S. at 462-63. With or without deference, we conclude that the NRC rationally explained how its current position is consistent with prior interpretations of § 20.1403(a). For example, the NRC explained that NUREG-1757 references "comparisons between restricted and unrestricted release," but it does not refer to a comparison of radiation doses as Shieldalloy suggests. Order at 18-19. The comparison relates to "regulatory costs avoided"—i.e., the costs avoided under a restricted plan can be included as benefits of an unrestricted decommissioning plan. Order at 20; *see Shieldalloy II*, 707 F.3d at 381 (discussing the cross-reference to Appendix N). "In other words, one of the benefits of reducing residual levels of radioactivity to levels that do not exceed 25 mrem [as required for unrestricted release under 10 C.F.R. § 20.1402] is the avoidance of costs that would otherwise be incurred were the licensee to pursue restricted release." Order at 20. Nothing in NUREG-1757 requires a comparison of dose levels to the public under restricted and unrestricted release. *See id.* at 21.

Similarly, the NRC explained that its July 5, 2007 letter to Shieldalloy does not call for a comparative dose-analysis. The letter simply suggested that Shieldalloy may have overestimated the work necessary to achieve unrestricted release, which could erroneously bias the ALARA analysis in favor of restricted release. *Id.* at 22-23. We agree with the NRC.

\* \* \*

Because New Jersey's regulations are compatible with the NRC's regulations and its reading of § 20.1403(a), we conclude that the NRC's transfer of regulatory authority to New Jersey under 42 U.S.C. § 2021 was not arbitrary or capricious.

**III.**

For the reasons stated, we deny Shieldalloy's petition for review of the NRC's order reinstating the transfer of its regulatory authority to the State of New Jersey.

*So ordered.*